OPINION
{¶ 1} Defendant-appellant Perry Lynn Bell appeals from his convictions and sentences in the Stark County Court of Common Pleas on two counts of aggravated robbery in violation of R.C. 2911.01 (A) (1), both with firearms specifications in violation of R.C. 2941.145, one count of receiving stolen property, in violation of R.C. 2913.51 (A) and two counts of having weapons while under disability in violation of R.C.2923.13 (A) (2). Plaintiff-appellee is the State of Ohio.
 {¶ 2} The William Penn Club in Alliance, Ohio is a private club-bar which requires a membership card to obtain entrance. Ann Hudson works as a bartender at the club, and her duties frequently include closing the bar. On the night of October 12, 2002, and early morning hours of October 13, 2002, Ms. Hudson closed the bar. The last member left the premises around 1:00 a.m. Ms. Hudson remained in the bar alone, stocking the cooler, counting out the register, putting the deposits into the office, and locking up. These tasks kept Ms. Hudson at the club until around 2:00 a.m.
 {¶ 3} Ms. Hudson placed the night deposit through a slot in the office door. The money taken in by the club was in an envelope, which fell through a mail slot in the door into a basket attached on the other side of the door. Ms. Hudson does not have access to the office in which the money is kept. When Ms. Hudson opened the door to leave the building, however, she was confronted by a man who jumped up from the side of her vehicle. The man had a gun in his hand.
 {¶ 4} Ms. Hudson jumped back inside the building and ran up four or five steps, knowing the door handle was locked behind her. She pretended to call 911 on a cell phone, but did not really have a phone. The person kept yelling for her to open the entrance door to the building. Suddenly, the glass in the entrance door shattered, a hand reached in and opened the door. A man then entered and walked up the steps to where Ms. Hudson was standing. The man demanded that Ms. Hudson open the door that led into the club, but Ms. Hudson could not get that door open. The man then took Ms. Hudson down the stairs and out the entrance door of the building to the alleyway where he took about $175 from Ms. Hudson's purse.
 {¶ 5} Eventually the pair returned inside the building and up the steps to the club's entrance door. Ms. Hudson was able to get the door to the club open. The man told Ms. Hudson to turn off the security system. Ms. Hudson replied that she didn't think it worked. After entering the club the pair walked down a hallway, and the man turned right at the office door, not attempting to enter any other part of the club. The man told Ms. Hudson to open the door to the office, but she did not have the key. Instead, he kicked in the office door and immediately grabbed a brief case, after which he reached for the envelopes in the basket behind the door.
 {¶ 6} Ms. Hudson and the man went back outside and walked across the parking lot towards a dumpster in an area of trees. The man told Ms. Hudson to get down on the ground, which she did, and he took off running away from the club.
 {¶ 7} Ms. Hudson later described the person who robbed the club and her as fairly tall, at least six feet, with a medium build. Ms. Hudson knew that he was a lightskinned black male, because she could see his wrist, although his hands were covered by gloves. The man was dressed in black with a black stocking over his face. He wore a charcoal gray jean jacket. At one point he had something in one hand that Ms. Hudson described as a long black stick; the gun was in one hand and the stick was in the other. At one point he used the stick to break out a light outside the club. Ms. Hudson was unable to recall the details of the gun other than it was a dark colored small handgun.
 {¶ 8} After the man took off, Ms. Hudson ran inside the club, locked the door and called the police. Michael Myers, the club manager, approximated that between $4,000 and $8,000 was stolen from the club during the robbery. The club had an unusual amount of money that night from pull tickets which had just been legalized by the City of Alliance.
 {¶ 9} Ms. Hudson recalled that during the evening of October 12, 2002, Michelle Myers, the daughter of Michael Myers, the club manager, had called earlier while Hudson was waiting on several customers. Michelle Myers wanted to know whether her father or her brother was at the club. Ms. Hudson told her that she didn't know where Michelle's brother was, but her father was at the lake for the weekend. Ms. Hudson later learned Michelle told her father, that she had not called the club that night.
 {¶ 10} Michael Myers, the branch manager of the William Penn Club, was out of town the weekend of the robbery. While he was gone, his house was burglarized and three guns were stolen. Michelle Myers drives a red Chevrolet Cavalier and she knew her father would be at the lake during the weekend of the robbery. When police investigated the break-in of the Myers' residence, they suspected it was staged to look like a break-in.
 {¶ 11} Patrolman Mark Welch, the first officer on the scene, also drew a connection between Michelle Myers and the robbery. Patrolman Welch was suspicious when he learned that the suspects had not bothered to look for a safe or try to open the safe that was in the club's office. When he learned of the earlier telephone call from Michelle Myers, Patrolman Welch recalled that earlier that day he had seen Michelle driving a red Chevrolet Cavalier with the appellant in the passenger seat. Patrolman Welch was familiar with both Michelle and the appellant.
 {¶ 12} A canine unit was brought in to track the route of the suspect. The canine unit led police northeast from the William Penn Club across South Street, through a wooded area and out into the intersection of Auld and Morgan where police found a black stocking hat. Subsequent testing of that hat revealed a partial DNA profile. Appellant could not be excluded as the source of the DNA. Ann Hudson testified that the cap was similar to the one worn by the robber.
 {¶ 13} While police were in the intersection, a tow truck driver approached to advise that there had been a red Chevrolet Cavalier parked across the street from Mel's Towing, near the intersection where the police found the hat. The car had been running the lights were out.
 {¶ 14} About this time, appellant was showing off money and talking about the robbery. Brandy Hyronimus was invited to a party that appellant threw at a hotel. Appellant told her that he was dating Michelle Myers, and that "he hit her dad for a lick and he didn't even care."
 {¶ 15} Detective Mucklo, the lead investigator, thought the robbery was an inside job, and attempted to reach Michelle Myers for questioning. He and other officers repeatedly went to Michelle's house between October 17 and October 21, but no one answered the door. Finally, on October 21 the police noticed mail and the detectives' business cards were piling up outside Michelle's door. A family member gave them permission to enter the residence on October 21, and they found Michelle upstairs, dead, the victim of a homicide.
 {¶ 16} When appellant was arrested for the charges in the case at bar, he asked what the charges were and questioned, "Is that all?" He also stated that the only person who could put him at the scene of the robbery was dead, a fact which he had pointed out to friends in the days proceeding his arrest.
 {¶ 17} After appellant was arrested, and the murder of Michelle Myers came to light, Nicole Ketler came forward with a .357 Rueger handgun that had been stolen from Michael Myers' home. Appellant had come to Ketler's house and ask her to keep it for him. Appellant subsequently called Ketler from the Stark County Jail and asked her whether she knew what happened at the William Penn Club. He told her he wanted to get their stories straight, and he added that he did not kill the girl.
 {¶ 18} Evidence was presented of appellant's prior conviction for two counts of aggravated robbery in the Stark County Court of Common Pleas, Case No. 88-8562 and the resulting sentence of five to twenty-five years.
 {¶ 19} Appellant called several witnesses including Latasha Stebbins, who claimed to have been with him at BB McClain's the night of the robbery. On cross examination, however, Stebbins acknowledged she was uncertain of the date.
 {¶ 20} Prior to the date of the trial, appellant waived counsel and choose to represent himself, despite his attorney's recommendation not to do so. Appellant signed a written waiver of his right to counsel. On the date of trial, the trial court had a jury ready and waiting to proceed, but appellant chose to waive the jury and try the case to the court. The trial court engaged in a dialogue with appellant noting that although appellant had represented himself in the past, he was entitled to representation and will be held to the same rules of evidence as the State. The trial court found that appellant knowingly and intelligently waived his right to counsel. The trial court appointed standby counsel to Mr. Bell. Stand-by counsel remained present throughout the bench trial, but appellant proceeded pro se.
 {¶ 21} At the conclusion of the trial, the court found appellant guilty as charged. Appellant was immediately sentenced to a total prison term of fifteen and one-half years. The trial court further ordered the prison term would be served consecutively to two terms appellant was already serving on unrelated cases, Stark County Court of Common Pleas, Case Nos. 2002-CR-1587 (unlawful sexual conduct with a minor) and 2002-CR-1443 (aggravated drug trafficking).
 {¶ 22} Appellant timely appealed and submits the following four assignments of error for our consideration:
 {¶ 23} "I. The trial court erred and thereby deprived the appellant, Perry Bell, appearing pro se, of due process of law as guaranteed by theFourteenth Amendment of the United States Constitutiion and Article One, Section Ten of the Ohio Constitution, as the prosecution failed to offer sufficient evidence to prove beyond a reasonable doubt that Mr. Bell committed aggravated robbery.
 {¶ 24} "II. The trial court erred and thereby deprived the appellant, Mr. Perry Bell, of due process of law as guaranteed by thefourteenth amendment of the united states constitution and Article One, Section Ten of the Ohio Constitution by finding Mr. Bell Guilty, as the verdict for the charges of aggravated robbery with firearms specifications, receiving stolen property, and possession of weapons under disability were against the manifest weight of the evidence.
 {¶ 25} "III. The trial court committed prejudicial error in imposing the maximum sentence to be served consecutively with one Mr. Bell is currently serving.
 {¶ 26} "IV. The trial court erred and thereby deprived the appellant, perry bell, of his right to effective assistance of counsel, as guaranteed by the Sixth Amendment of the United States Constitution and Article One, Section Ten of the Ohio Constitution, when it allowed Mr. Bell to proceed with his pro se representation of aggravated burglary charges with firearm specifications."
 I. II. {¶ 27} In his First Assignment of Error, appellant maintains that his convictions are against the sufficiency of the evidence. In his Second Assignment of Error appellant contends that his convictions are against the manifest weight of the evidence. We shall address these assignments of error together.
 {¶ 28} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Gulley (Mar.15, 2000), 9th Dist. No. 19600, at 3. "While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion."State v. Thompkins (1997), 78 Ohio St.3d 380, 390.
 {¶ 29} In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by State constitutional amendment on other grounds in State v. Smith
(1997), 80 Ohio St.3d 89.
 {¶ 30} Specifically, an appellate court's function, when reviewing the sufficiency of the evidence to support a criminal conviction, is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks, supra. This test raises a question of law and does not allow the court to weigh the evidence.State v. Martin (1983), 20 Ohio App.3d 172, 175. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v.Thompkins, 78 Ohio St.3d at 386.
 {¶ 31} "Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462. Thus, a determination that a conviction is supported by the weight of the evidence will also bedispositive of the issue of sufficiency. Cuyahoga Falls v. Scupholm (Dec. 13, 2000), 9th Dist. Nos. 19734 and 19735, unreported.
 {¶ 32} In determining whether a conviction is against the manifest weight of the evidence, an appellate court: "[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 33} A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. State v. Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. Id. at 388. An appellate court must make every reasonable presumption in favor of the judgment and Findings of Fact of the trial court. Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact." State v. Clemons (1998), 82 Ohio St.3d 438, 444, citing State v.Jenks, 61 Ohio St.3d at 273. Therefore, this Court's "discretionary power * * * should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; See, also, Otten, 33 Ohio App.3d at 340.
 {¶ 34} In State v. Thompkins (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, the Ohio Supreme Court held "[t]o reverse a judgment of a trial court on the basis that the judgment is not sustained by sufficient evidence, only a concurring majority of a panel of a court of appeals reviewing the judgment is necessary." Id. at paragraph three of the syllabus. However, to "reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." Id. at paragraph four of the syllabus; State v. Miller
(2002), 96 Ohio St.3d 384, 2002-Ohio-4931 at ¶ 38, 775 N.E.2d 498.
 {¶ 35} Appellant was convicted of two (2) counts of Aggravated Robbery. Both counts were accompanied by a firearm specification. R.C.2911.01(A)(1) provides: "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following: (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it . . ."
 {¶ 36} In the case at bar, Ann Hudson, the part-time bartender at the William Penn Club testified that as she was closing the Club and attempting to leave she was accosted by a fairly tall, approximately six (6) foot, light skinned, medium build male. (1T. at 38-39). The man had a gun in one hand and a long black stick in the other hand. (Id. at 31; 40; 43). The assailant was wearing a black "toboggan" hat. (Id. at 39). The hat was similar to the hat the police recovered near the area. (Id. at 42-43). The assailant took approximately $175.00 from Ms. Hudson's purse. (Id. at 33-34). The assailant additionally removed approximately $4,000.00 to $8,000.00 from the Club. (Id. at 109-110).
 {¶ 37} Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that an aggravated robbery occurred both with respect to Ms. Hudson, and the William Penn Club. Appellant's main argument is that there was insufficient evidence to identify him as the assailant in the robberies.
 {¶ 38} Police used a K-9 unit to track the route the suspect took when he fled the William Penn Club. The K-9 eventually led the police to the intersection of Auld and Morgan where they found a black stocking hat. (1T at 92-96). A partial DNA profile was obtained from the hat. Appellant could not be excluded as a possible source of the DNA. (Id. at 170-71). The probability of picking an individual at random that could have the partial DNA type found on the hat was 1 in 7. (Id. at 171).
 {¶ 39} While at the intersection, a tow truck driver approached the investigating officer to advise the officer that he had observed a red Chevy Cavalier parked near the intersection where the police had found the hat. (2T. at 294-96). The vehicle's headlights were off, but the engine was running. (Id.). Ptl. Mark Welsh testified that he recalled observing appellant in the passenger seat and Michelle Myers driving a red Chevy Cavalier earlier that day. (1T. at 71-73). A black baseball bat was recovered from the trunk of Ms. Meyers' red Chevy Cavalier. The bat was consistent with the "stick" that Ms. Hudson observed in the assailant's hand at the time of the robbery. (1T. at 43; 181).
 {¶ 40} Upon his arrest appellant informed the officers that the only person who could put him at the scene of the robbery, Michelle Myers, was dead. (Id. at 199-200).
 {¶ 41} Viewing this evidence linking appellant to the aggravated robbery of Ms. Hudson and the William Penn Club in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that appellant had committed the crimes of aggravated robbery.
 {¶ 42} We hold, therefore, that the State met its burden of production regarding each element of the crime of aggravated robbery with a firearm specification and, accordingly, there was sufficient evidence to support appellant's convictions.
 {¶ 43} Although appellant presented his witness in an attempt to establish an alibi, the witnesses were uncertain of the date that appellant was with them. (3T. at 15-17; 18-19). The trier of fact was free to accept or reject any and all of the evidence offered by the appellant and assess the witness's credibility. Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. State v. Jenks (1991),61 Ohio St. 3d 259, 574 N.E. 2d 492.
 {¶ 44} We conclude the trier of fact, in resolving the conflicts in the evidence, did not create a manifest miscarriage of justice so as to require a new trial. Viewing this evidence in a light most favorable to the prosecution, we further conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant in attempting or committing a theft offense or in fleeing immediately after the attempt or offense had a deadly weapon on or about the appellant's person or under the appellant's control and either displayed the weapon, brandished it, or indicated that he possessed a deadly weapon.
 {¶ 45} Accordingly, appellant's convictions for aggravated robbery with the attendant firearm specifications were not against the manifest weight of the evidence.
 {¶ 46} To find the appellant guilty of receiving stolen property as alleged in the case at bar, the trier of fact would have to find appellant received, retained, or disposed of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense. R.C. 2913.51(A).
 {¶ 47} In the case at bar, the State presented evidence of a break-in at the home of Michael Myers. (1T. at 106). Mr. Myers is the father of Michelle Myers. (Id. at 110). Although many valuable items were inside the home, the only property missing was a Rueger Blackhawk .357 magnum handgun, an "off-brand" .22 caliber handgun and a.22 caliber rifle. (Id. at 107). Mr. Myers testified that the handguns had been loaded at the time they were stolen. (Id. at 108).
 {¶ 48} While at a party, appellant remarked that he had "hit her dad [Michelle's] for a lick and he didn't even care." (Id. at 126-27). The witness understood appellant's statement to mean that he had robbed or stolen from Mr. Myers. (Id.).
 {¶ 49} Nicole Ketler testified that she has known appellant for approximately four years. (2T. at 232). While using her friend Amanda Hobbs' car, Ms. Ketler was informed that appellant had put a weapon into the trunk. (Id. at 233-34). Ms. Ketler testified that appellant came to her home and requested that she put the weapon in her house so that appellant could retrieve it at a later time. (Id. 237). Ms. Ketler testified that appellant put the box containing the weapon in the cabinet above her refrigerator. (Id. 237-38). Ms. Ketler turned the weapon over to the police. (Id. at 236-38). Appellant telephoned Ms. Ketler from the county jail after he was arrested. (Id. at 252). Appellant asked Ms. Ketler if she knew what happened at the William Penn Club. (Id. at 239). Appellant then stated "we have to get our stories straight." (Id.).
 {¶ 50} Detective Griffith testified that the weapon turned in by Ms. Ketler was turned over to Patrolman Wonner. (Id. at 198). Patrolman Wonner testified that the weapon was shown to Mr. Myers (Id. at 159). Mr. Myers identified the weapon as the.357 Rueger Blackhawk handgun that had been stolen from his home. (Id. at 108-9).
 {¶ 51} Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Mr. Myers' handgun had been stolen and that appellant had possessed the .357 Rueger Blackhawk handgun that had been stolen from the home of Mr. Myers.
 {¶ 52} Although appellant argued that Mr. Myers could not be 100% certain that the weapon was his due to the lack of serial numbers, the trier of fact was free to accept or reject any and all of the witness's testimony and assess the witness's credibility. Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. State v. Jenks (1991),61 Ohio St. 3d 259, 574 N.E. 2d 492.
 {¶ 53} We conclude the trier of fact, in resolving the conflicts in the evidence, did not create a manifest miscarriage of justice so as to require a new trial. Viewing this circumstantial evidence in a light most favorable to the prosecution, we further conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant received or retained the property of Michael Myers, knowing or having reasonable cause to believe that the property had been obtained through the commission of a theft offense, in violation of R.C. 2913.51. Accordingly, appellant's conviction for receiving stolen property was not against the manifest weight of the evidence.
 {¶ 54} To find the appellant guilty of two counts of having a weapon while under a disability as alleged in the case at bar, the trier of fact would have to find that appellant, unless relieved from disability as provided in section 2923.14 of the Revised Code, knowingly acquired, had, carried, or used any firearm or dangerous ordnance, and that appellant was under indictment for or has been convicted of any felony offense of violence. R.C. 2923.13(A) (2). The dates of the violations as alleged in the indictment were October 13 and 21, 2002.
 {¶ 55} The incident at the William Penn Club in Alliance, Ohio occurred on or about October 13, 2002. As previously explained, sufficient credible evidence support appellant's conviction of the aggravated robbery charges in connection with the William Penn Club and Ms. Hudson.
 {¶ 56} The .357 Rueger handgun that was stolen from the home of Mr. Myers was recovered by the police from Nicole Ketler on October 22, 2002. (2T. at 243; 245). Ms. Ketler was informed that the handgun was in the trunk of Ms. Hubbs' car on October 21, 2002. (Id. at 246). Appellant removed the handgun from the trunk and placed it inside Ms. Ketler's home later on that same day. (Id. at 247).
 {¶ 57} Evidence was presented at trial of appellant's prior conviction for two counts of aggravated robbery in Stark County Court of Common Pleas, Case Number 88-8562 and the resulting sentence of five to twenty-five years. (Id. at 302-305).
 {¶ 58} Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that that appellant had possessed a handgun during the commission of the aggravated robberies on October 13, 2002 and that appellant had possession of the .357 Rueger Blackhawk handgun that had been stolen from the home of Mr. Myers and that appellant had a prior conviction for a felony offense of violence.
 {¶ 59} We conclude the trier of fact, in resolving the conflicts in the evidence, did not create a manifest miscarriage of justice so as to require a new trial. Viewing this circumstantial evidence in a light most favorable to the prosecution, we further conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant had possessed a handgun during the commission of the aggravated robberies on October 13, 2002 and that appellant had possession of the .357 Rueger Blackhawk handgun that had been stolen from the home of Mr. Myers and that appellant had a prior conviction for a felony offense of violence.
 {¶ 60} Appellant's First and Second Assignments of error are overruled.
 III. {¶ 61} In his Third Assignment of Error, appellant contends that the trial court erred in imposing consecutive sentences and maximum sentences. We disagree.
 {¶ 62} Pursuant to the enactment of Senate Bill 2 in 1996, an appellate court's review of an appeal from a sentence is set forth in R.C. 2953.08. Specifically, 2953.08(A) presently reads:
 {¶ 63} "(A) In addition to any other right to appeal and except as provided in division (D) of this section, a defendant who is convicted of or pleads guilty to a felony may appeal as a matter of right the sentence imposed upon the defendant on one of the following grounds:
 {¶ 64} "(1) The sentence consisted of or included the maximum prison term allowed for the offense by division (A) of section 2929.14 of the Revised Code, the sentence was not imposed pursuant to division (D)(3)(b) of section 2929.14 of the Revised Code, the maximum prison term was not required for the offense pursuant to Chapter 2925. or any other provision of the Revised Code, and the court imposed the sentence under one of the following circumstances:
 {¶ 65} "(a) The sentence was imposed for only one offense.
 {¶ 66} "(b) The sentence was imposed for two or more offenses arising out of a single incident, and the court imposed the maximum prison term for the offense of the highest degree.
 {¶ 67} "(2) The sentence consisted of or included a prison term, the offense for which it was imposed is a felony of the fourth or fifth degree or is a felony drug offense that is a violation of a provision of Chapter 2925. of the Revised Code and that is specified as being subject to division (B) of section 2929.13 of the Revised Code for purposes of sentencing, and the court did not specify at sentencing that it found one or more factors specified in divisions (B) (1) (a) to (i) of section2929.13 of the Revised Code to apply relative to the defendant. If the court specifies that it found one or more of those factors to apply relative to the defendant, the defendant is not entitled under this division to appeal as a matter of right the sentence imposed upon the offender.
 {¶ 68} "(3) The person was convicted of or pleaded guilty to a sexually violent offense, was adjudicated as being a sexually violent predator, and was sentenced pursuant to division (A) (3) of section 2971.03
of the Revised Code, if the minimum term of the indefinite term imposed pursuant to division (A) (3) of section 2971.03 of the Revised Code is the longest term available for the offense from among the range of terms listed in section 2929.14 of the Revised Code. As used in this division, `sexually violent offense' and `sexually violent predator' have the same meanings as in section 2971.01 of the Revised Code.
 {¶ 69} "(4) The sentence is contrary to law.
 {¶ 70} "(5) The sentence consisted of an additional prison term of ten years imposed pursuant to division (D) (2) (b) of section 2929.14 of the Revised Code.
 {¶ 71} "(6) The sentence consisted of an additional prison term of ten years imposed pursuant to division (D) (3) (b) of section 2929.14 of the Revised Code."
 {¶ 72} Additionally, pursuant to State v. Comer, 99 Ohio St.3d 463,2003-Ohio-4165, and its progeny, a trial court is required to make its statutorily enumerated findings and give reasons supporting those findings at the sentencing hearing when imposing consecutive or maximum sentences.
 Consecutive Sentences {¶ 73} Appellant first challenges the imposition of consecutive sentences as to the counts of receiving stolen property and having weapons while under a disability. The trial court further order that the sentence in the case at bar run consecutive to the sentences appellant received in Stark County Court of Common Pleas, Case Numbers 2002CR1587 and 2002CR1443.
 {¶ 74} R.C. 2929.14(E) (4) provides:
 {¶ 75} "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 {¶ 76} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 77} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 78} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 79} Appellant in the case at bar fails to specify exactly which findings the trial court failed to make, or why the findings made by the trial court are insufficient. Appellant has wholly failed to cite any specific place in the trial court's record where any of the errors are alleged to have occurred. App.R. 16(A) (7).
 {¶ 80} R.C. 2929.14(E)(4) requires the court to make three findings in order to sentence an offender to consecutive sentences: (1) consecutive sentences are "necessary to protect the public from future crime or to punish the offender, * * * [(2)] consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, * * * [and (3)] [t]he offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 81} "Consecutive sentences are reserved for the worst offenses and offenders." Comer, 99 Ohio St.3d 463, at ¶ 21 (citation omitted). Thus, in imposing consecutive sentences, the trial court must support its decision with specific findings as to all three requirements of R.C.2929.14(E) (4). Id.
 {¶ 82} The trial court specifically found that each requirement of R.C. 2929.14(E) (4) was present. In support of its findings, the trial court stated at the sentencing hearing that its decision was based on appellant's criminal past and lack of rehabilitation, and the numerous felonies involved in appellant's past, including a previous aggravated robbery. (3T. at 58-61; 65). The Court further based its decision on appellant's likelihood of recidivism. (Id. at 60; 64-65). The trial court further noted that robbing an individual with a weapon is the worst from of an aggravated robbery. (3T. at 58).
 {¶ 83} These factors clearly support the trial court's conclusion that consecutive prison terms are necessary to protect the public and punish the offender. They further support the trial court's conclusion that consecutive sentences, in this case, are not disproportionate to the criminal conduct involved here and appellant's' subsequent danger to the public. Moreover, these findings substantiate the trial court's determination that appellant's criminal history necessitates consecutive sentences to protect the public from future crimes.
 {¶ 84} Thus, we find that the trial court provided sufficient findings as to all three elements required to impose consecutive sentences.
 Maximum Sentences {¶ 85} Appellant next challenges the court's imposition of statutory maximum felony sentences on each count.
 {¶ 86} In order to modify or vacate a maximum sentence on appeal, an appellant bears the burden of demonstrating, by clear and convincing evidence that the trial court erred in imposing the maximum sentence. SeeState v. Johnson, Washington App. No. 01CA5, 2002-Ohio-2576, citing Griffin Katz, Ohio Felony Sentencing Law (2001 Ed.) 725, § T 9.16.
 {¶ 87} R.C. 2929.14(C) sets forth the following conditions under which a trial court may impose a maximum sentence: "(C) Except as provided in division (G) of this section or in Chapter 2925 of the Revised Code, the court imposing a sentence upon an offender for a felony may impose the longest prison term authorized for the offense pursuant to division (A) of this section only upon offenders who committed the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders under division (D)(3) of this section, and upon certain repeat violent offenders in accordance with division (D)(2) of this section." We read this statute in the disjunctive. See State v. Comersford (June 3, 1999), Delaware App. No. 98CA01004. Consequently, a maximum sentence may be imposed if the trial court finds any of the above-listed offender categories apply. Additionally, a trial court must state its reasons supporting an R.C.2929.14(C) maximum sentence finding. R.C. 2929.19(B) (2) (d).
 {¶ 88} As previously noted, the trial court set forth at length appellant's prior felony record. (3T. at 58-60). The court noted: "if you look at the years immediately following his release [from prison] you'll find that Mr. Bell started to get back into a life of crime fairly soon thereafter. That's evidenced by his involvement in the drug trafficking as early as November of 2001, culminating short of this offense in unlawful sexual conduct in July . . . 2002 . . . So, I find that Mr. Bell, without a doubt, poses a great likelihood of committing future crimes . . ." (Id. at 60). The trial court specifically found that appellant had committed the worst form of aggravated robbery. (Id. at 58).
 {¶ 89} Based on the foregoing, we hold the trial court sufficiently stated its findings and reasons under R.C. 2929.14(C), and we conclude appellant has failed to demonstrate a reversible maximum sentence error under the circumstances of this case.
 {¶ 90} In summary, we hold the trial court did not err in imposing consecutive sentences for receiving stolen property and having weapons while under disability, in imposing appellant's sentence in the case at bar consecutively to appellant's sentences in Stark County Court of Common Pleas, Case Numbers 2002CR1587 and 2002CR1443, and in imposing maximum sentences as to each count.
 {¶ 91} Accordingly, appellant's Third Assignment of Error is overruled.
 IV. {¶ 92} In his Fourth Assignment of Error, appellant argues that the trial court abused its discretion by permitting him to act as his own attorney. We disagree.
 {¶ 93} A criminal defendant's right to the assistance of counsel is constitutionally protected. State v. Tymcio (1975), 42 Ohio St.2d 39, 43,325 N.E.2d 556, 559-560. The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, guarantees that a defendant in a criminal trial has an independent right of self representation and that he may proceed to defend himself without counsel when he voluntarily, knowingly and intelligently elects to do so. State v. Gibson (1976),45 Ohio St.2d 366, paragraph one of the syllabus, citing Faretta v.California (1975), 422 U.S. 806, 819.
 {¶ 94} Crim.R. 44 governs the procedure for waiver of counsel in "serious offense" cases. It provides:
 {¶ 95} "(A) Where a defendant charged with a serious offense is unable to obtain counsel, counsel shall be assigned to represent him * * *, unless the defendant, after being fully advised of his right to assigned * * counsel, knowingly, intelligently, and voluntarily waives his right to counsel."
 {¶ 96} Crim.R. 44(C) further provides that in "serious offense" cases, the waiver must be in writing.
 {¶ 97} However, the written waiver provision of Crim.R. 44 is not a constitutional requirement, and, therefore, trial courts need demonstrate only substantial compliance. State v. Martin (2004), 103 Ohio St.3d 385,2004-Ohio-5471, 816 N.E.2d 227. A criminal defendant may waive his or her right to counsel either expressly or impliedly from the circumstances of the case. State v. Weiss (1993), 92 Ohio App.3d 681, 684. An effective waiver requires the trial court to "* * * make sufficient inquiry to determine whether [the] defendant fully understands and intelligently relinquishes that right." Gibson at paragraph two of the syllabus.
 {¶ 98} In State v. Martin, supra, Ohio Supreme Court reiterated the following standard to assess the validity of a waiver of counsel; "`[t]o be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.'" [State v. Gibson (1976),45 Ohio St.2d 366] at 377 quoting Von Moltke v. Gillies (1948),332 U.S. 708, 723, 68 S.Ct. 316, 92 L.Ed. 309. Martin, supra at ¶ 40. The trial court must demonstrate substantial compliance by making a sufficient inquiry to determine whether the defendant fully understood and intelligently relinquished his or her right to counsel. Martin, supra at 392, 2004-Ohio-5471 at ¶ 38, 816 N.E.2d at 234.
 {¶ 99} In verifying that a defendant's waiver of counsel is made knowingly, voluntarily, and intelligently, a trial court should determine whether the defendant was advised of the dangers and disadvantages of self representation. See Gibson, 45 Ohio St.2d at 377. See, also,Faretta, 422 U.S. at 835; State v. Weiss (1993), 92 Ohio App.3d 681,686. The trial court should also consider whether the defendant was advised of the nature of the charges and the range of allowable punishments, and, in addition, may consider whether the trial court advised the defendant of the possible defenses to the charges and applicable mitigating circumstances. See Gibson, 45 Ohio St.2d at 377, citing Von Moltke v. Gillies (1948), 332 U.S. 708, 724, 92 L.Ed. 309. A court may also consider various other factors, including the defendant's age, education, and legal experience. State v. Doane (1990),69 Ohio App.3d 638, 647.
 {¶ 100} "A judge can make certain that accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all of the circumstances under which such a plea is tendered." Von Moltke, supra, at 724. "The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Johnson v. Zerbst (1938), 304 U.S. 458, 464. A sketchy or minimal inquiry touching upon only some of the above-enumerated factors will not adequately establish an effective waiver of counsel.State v. McQueen (1997), 124 Ohio App.3d 444, 447.
 {¶ 101} After the right to counsel has been properly waived, trial courts may appoint standby counsel to assist the pro se defendant.Martin, supra, at ¶ 28. Nevertheless, the defendant has no right to hybrid representation, which presents problematic ethical issues concerning effective assistance of counsel when counsel has taken a more active role in the defense. Id., at ¶ 33. Thus, when permitted to go beyond mere consultation, hybrid representation may constitute reversible error. See Id.
 {¶ 102} In this case, the record contains a written waiver of counsel pursuant to Crim. R. 44 which appellant signed on February 5, 2004. In addition, the trial court verified that the appellant's waiver of counsel was made knowingly, voluntarily, and intelligently, and further advised appellant of the dangers and disadvantages of self representation. (1T. at 6-12). The trial court appointed an experienced criminal defense attorney as standby counsel to assist the appellant. (Id. at 6; 8-9; 11-12).
 {¶ 103} The trial court properly obtained a written waiver by the appellant of his right to counsel. The trial court further correctly conducted an inquiry to assure that appellant's decision to represent himself was a knowing, intelligent and voluntary choice. The trial court appointed an experienced attorney who was capable of assisting appellant during the trial. Accordingly, the trial court properly exercised its discretion in permitting appellant to exercise his Sixth Amendment right of self representation.
 {¶ 104} Appellant's Fourth Assignment of Error is overruled.
 {¶ 105} For the foregoing reasons, the judgment of the Court of Common Pleas of Stark County, Ohio, is affirmed.
Gwin, J., Boggins, P.J., and Hoffman, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Stark County, Ohio, is affirmed. Costs to appellant.